Filed 7/15/25  P. v. Amador CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C099960 |
| Plaintiff and Respondent, | (Super. Ct. No. 21FE010974) |
| v. | |
| ADAN CORDERO AMADOR, | |
| Defendant and Appellant. | |

SUMMARY OF THE APPEAL

A jury convicted defendant Adan Cordero Amador of the first-degree murder of David Falcon.  (Pen. Code, § 187, subd. (a).)  The jury found true that defendant personally discharged a firearm during the murder, resulting in death.  (Pen. Code, § 12022.53, subd. (d).)  The trial court sentenced defendant to a term of 25 years to life on the first-degree murder charge, with an additional consecutive term of 25 years to life

1

for the firearm enhancement.  In this appeal, defendant argues his trial counsel was prejudicially ineffective in seven ways.  We affirm the judgment.

FACTS AND HISTORY OF THE PROCEEDINGS

Initial Meeting and Sale of Cocaine

On the afternoon of June 28, 2021, defendant and Victoria L., a couple who had an on-again/off-again romantic relationship, were in Old Sacramento sitting in defendant's family's Toyota Venza.

Falcon, whom they had not previously met, approached Victoria and defendant and asked if they knew where to get cocaine.  The three of them arranged for defendant and Victoria to obtain cocaine and bring it to Falcon.  Victoria and Falcon exchanged cell phone numbers.

A little after 9 p.m., Falcon texted Victoria and let her know he was in the south of Sacramento.  She responded, "text my boyfriend," referring to defendant, and forwarded Falcon defendant's contact information.   Falcon responded, "[o]k good lookin."  When Falcon continued to contact Victoria, she gave defendant her phone.  Up to 11:21 p.m., Falcon texted and had calls with both defendant's and Victoria's phones.  They arranged for a location where defendant and Victoria would meet with Falcon to sell Falcon cocaine.  According to Victoria, defendant bought cocaine to sell in turn to Falcon.  Victoria, defendant, and Falcon arranged to meet at the Holiday Inn Express off Laguna and Bond Road in Elk Grove.  One text sent from Victoria's phone to Falcon's said, "my bf was accidentally texting you . . . ."  A detective testified at trial that "bf" was shorthand for "boyfriend."

Surveillance footage from the Holiday Inn Express and traffic cameras showed that Falcon arrived at the hotel parking lot in his white Chevy Tahoe (Tahoe) on June 28, 2021, at approximately 9:24 p.m.  He at first parked near the entrance, but he moved his car to another spot at 10:41 p.m.  At approximately 11:22 p.m., defendant and Victoria

2

arrived in the parking lot in a white Toyota Venza. Defendant was driving and Victoria was in the passenger seat.

The surveillance film showed the Venza parked next to the Tahoe. Defendant and Victoria sold Falcon the cocaine, then got into the Tahoe with Falcon. Falcon sat in the driver's seat, and Victoria and defendant sat in the back of the Tahoe, with defendant on the driver's side and Victoria on the passenger side. Falcon and defendant both used some of the cocaine, and Victoria might have used some.

According to Victoria, Falcon got flirtatious with her. When defendant was not looking, Falcon would do things like put his fingers in a V shape around his mouth and move his tongue up and down between them, tell her " 'you look fine as fuck,' " and asked her to go to his hotel room with him. She took this to mean he wanted to perform oral sex on her. Falcon did these things quietly and in a way defendant would not see.

Eventually, Victoria said something like, "[m]y boyfriend is right here. Can you see that? That's pretty, like, that's just hella disrespectful.' " Victoria told defendant they should leave, and as they were leaving Falcon said something to defendant about what he would do if Victoria were his girl. According to Victoria, defendant seemed quiet and upset when they left.

Defendant and Victoria left at approximately 11:43 p.m.

Defendant Learns About Falcon's Behavior

According to Victoria, when she and defendant returned to the Venza, she told him what Falcon had said and done. Defendant got very quiet. She could tell he was mad. She encouraged defendant to let it go.

Victoria and defendant went back to his house, where she slept in his bed that night. At some point, defendant left, telling Victoria he was going to go get something to smoke.

3

At 12:42 a.m. on June 29, 2021, Falcon called Victoria's cell phone. Someone answered and the call lasted 12 seconds. At 12:44 a.m. on June 29, 2021, Falcon texted Victoria "wya"—where you at. Between 12:56 and 1:03 a.m., Falcon sent Victoria's and defendant's cell phones texts seeking another half gram to gram of cocaine.

At 1:53 a.m., Falcon texted Victoria's cell, stating he was in the same location he had been earlier. Surveillance footage showed the Venza returning to the parking lot at 1:53 a.m. At 1:58 a.m., defendant was walking around the parking lot, where he walked up to a van.

At 2:00 a.m., Falcon texted Victoria's cell phone asking where 'the recipient' was.

At 2:11 a.m., Falcon called Victoria's cell phone. Someone answered and the call lasted approximately seven seconds. At 2:12 a.m., defendant sent Falcon a text asking for his location. At 2:13 a.m., defendant called Falcon. The call was answered and lasted for 52 seconds. During the call, Falcon got in the Tahoe and drove it around the parking lot. Surveillance video showed defendant walking around and using two cell phones in this timeframe.

Falcon backed the Tahoe into a parking stall with the doors closed at 2:15 a.m. Less than one minute later, defendant walked up to the passenger door and opened it. Approximately 40 seconds later, defendant shot Falcon twice. Falcon opened the driver's door of the Tahoe and fell to the ground.

Defendant ran through the parking lot back to the Venza and drove out at approximately 2:17 a.m.

The driver of the van defendant had approached earlier started to leave the parking lot, but he saw Falcon on the ground and went to the hotel lobby to ask staff to call law enforcement. No one approached Falcon's body or entered his vehicle between the shooting and when law enforcement officers arrived.

<u>Investigation</u> <u>and</u> <u>Defendant's</u> <u>Arrest</u>

Law enforcement officers who arrived at the Holiday Inn Express tried to save Falcon but paramedics pronounced Falcon dead.

Investigators found one Blazer nine millimeter Luger cartridge casing on the ground and one on the floorboard of the backseat of Falcon's Tahoe.

There was miscellaneous clothing in the Tahoe, a football on the floorboard of the back seat, a beer in the center console, and other miscellaneous items in the car. Examination of the Tahoe at the place of the crime and a later search of the car at the evidence storage facility did not find any weapons or replicas of guns. The only metal object that was found was a multitool that was smaller than five inches found in the driver's side storage area of the Tahoe. No weapons were found on Falcon.

Fingerprints taken from the front passenger door of the Chevy Tahoe matched those of defendant.

Detectives identified the Venza as registered to defendant's mother.

Late in the morning of June 29, 2021, an officer began watching defendant's house and he saw defendant drive the Venza into the garage.

Later, a SWAT team went to the house and defendant, lying next to Victoria, got up and ran out of the room they were in. An officer in a helicopter recorded defendant leaving and reentering the rear of the home through a sliding door twice. Defendant appeared to have a dark object in his hands at one point. Defendant was not in view the entire time he was in the backyard.

Once defendant left the residence he was placed in custody.

Officers who searched the home found a nine millimeter Blazer Luger round in a pencil box in a bedroom, approximately 20 nine millimeter rounds in a toilet in the bathroom along with a box for Blazer ammunition, and a nine millimeter Glock-styled handgun hidden in a cinderblock in the backyard with a magazine and unfired cartridges.

5

A round was extracted from the chamber of the gun. Officers also found two Blazer nine millimeter rounds in a storage area of the Venza, and another in the tire compartment of the Venza. A criminologist later determined that the bullet casings found at the scene of the murder were fired from the gun found in defendant's backyard. DNA tests revealed defendant's DNA was on the gun.

Detective Nicole Monroe interviewed Victoria. In a portion of the interview, Detective Monroe told Victoria that someone was shot and killed the prior night. Detective Monroe asked Victoria if she knew anything about the shooting. Victoria began shaking and responded, "Adan did it." When Detective Monroe asked Victoria how she knew Adan had killed Falcon, Victoria responded, "[b]ecause how else would it happen? Why else would he park his car in here? Why else would he probably not want to tell me stuff? Why else would he—why else? Why else?"

During trial, Detective Monroe referred to transcripts from her interviews with Victoria. Detective Monroe agreed with the prosecutor's statements that: (1) Victoria told Detective Monroe that defendant said he was going to fight Falcon because he felt "disrespected" when Falcon hit on Victoria in front of him; and (2) defendant wanted Victoria's help setting Falcon up, but Victoria did not want to do that. Victoria told Detective Monroe her "boyfriend's" plan was to meet up with Falcon, pull up beside him, pretend to sell him cocaine, and fight him. When Detective Monroe asked Victoria why she thought defendant was going to go fight Falcon, Victoria responded, "[b]ecause he was going to hurt him because he was a psychopath."

Referring to the interview transcript, Detective Monroe testified that Victoria told her she begged defendant not to meet up with Falcon and to let it go. Detective Monroe said Victoria told her that after Victoria told defendant she was not going to text Falcon and set him up, defendant took her phone. The next morning Victoria noticed messages had been deleted from her phone.

6

At trial, Victoria responded, "no" when asked if defendant ever told her he wanted to use her phone to set Falcon up so defendant could beat up Falcon. She said she did not think defendant planned to beat up Falcon. She answered, "no" when asked if defendant took her phone the night of the murder. However, Victoria admitted she told Detective Monroe that defendant had taken her cell phone, and she had not realized it until the next morning. She admitted she told Detective Monroe that defendant had her password, and that defendant had her password because he was her boyfriend and had access to her phone.

Detectives Interview Defendant

On the evening of June 29, 2021, detectives conducted a taped interview of defendant.

In the interview, defendant described Victoria as his girlfriend. He said they had been dating on and off for two to three years. When asked about how he saw the relationship going he responded, "[h]onestly, I hope, but you know?"

For most of the interview, defendant denied facts that would link him to the crime. He denied he or anyone in his household owned a firearm or had ammunition, and claimed the last time he handled a weapon was four years earlier in Mexico. He denied driving the Venza the day before. He denied being in Elk Grove the day before. He denied ever going to the Holiday Inn Express, and said he did not know anyone with a white Chevy Tahoe. He denied ever meeting Falcon when shown pictures of Falcon. He said if someone was seen driving the Venza at around 1:30 a.m. in Elk Grove, it was likely his mother who sometimes works a night shift off Laguna.

After detectives presented defendant with some of the evidence they had gathered linking him to the crime, he slowly began to change his story. First, he said he did not shoot the victim, but that he was by the Tahoe at a gas station the night before. Defendant said he was alone, he pulled up to Falcon's car and gave Falcon a shot of

7

Hennessey. He said Falcon asked him for something, and defendant called a dealer, then defendant went home.

Then, when a detective told defendant they could prove he killed Falcon, defendant then said, "[h]e was trying to pull a gun on me."

Defendant said Falcon had kept calling him and telling him to go to a corner of the parking lot. Defendant said when he asked why, Falcon reached over, trying to pull a gun, and defendant shot Falcon once.

Defendant later said Falcon had pulled out a Glock and aimed it at him, and defendant shot Falcon once. Defendant said he ran for his life and he thought Falcon got back in his car.

Officers told defendant that the shooting was recorded on video and that there was a witness in the parking lot.

When the officers said Falcon had not moved away from the Tahoe, defendant said, "I seen the gun." He said the gun was black and Falcon was aiming at him.

When asked why he did not call for help, defendant said he did not get help because Falcon had tried to disrespect defendant and his "girlfriend." He said Falcon had been acting sexually with her and tried to get with her while defendant was in the car. He said that the disrespect had happened the first time he was with defendant the night before, when his girlfriend was there and defendant was selling cocaine, which defendant said was really baking soda.

Defendant said Falcon made Victoria uncomfortable.

Defendant said when he went up to Falcon at the later meeting, Falcon was "twacked out" and all over the place. Falcon asked defendant why he didn't bring Victoria with him. Defendant asked Falcon if he had the money, and Falcon said he only had $40. Defendant said he then gave Falcon a vial, and Falcon reached over for "his thing," and defendant grabbed his own gun.

8

Defendant then changed his story again, and he said he shot Falcon two times. Defendant maintained he ran because he thought Falcon was going to shoot him back. He said again that he had feared for his life.

When told there was no gun in the car, defendant again said maybe Falcon tossed it. When told Falcon had just slumped over, defendant said something about a possible replica, or "something black," that was "like a gun." He said Falcon had reached for something in the door pocket.

Defendant said he thought Falcon was reaching for a gun because defendant didn't bring, "my girl." He said Falcon, "kept trying to get on my girl." He said Falcon suggested they go to the hotel and have a threesome. Defendant admitted the way Falcon was talking made him angry.

Defendant said the first time he went to Elk Grove, he did not get enough cocaine and brought baking soda. He said he sold Falcon baking soda for $60.

He said Falcon then reached out to him for more, and Falcon told him to "bring your girl." He said he told Falcon he was going to bring Victoria the second time. He said Falcon had said he would pay $80 for the next sale. He planned to sell him baking soda again. When officers suggested defendant would not have gone out to Elk Grove if he thought Falcon was going to be angry at him for ripping him off and might try to harm him, defendant said he wasn't afraid of anything like that. He said, "I was already jealous that he was already trying to get at my girl. So, I was, like, all right, maybe he wants to, like, fight or something."

Defendant said he did not drive to Elk Grove with the intent to kill Falcon. Defendant agreed Falcon had disrespected him and treated him like a punk with respect to Victoria.

Defendant said when he opened the car door, he asked why Falcon was going to act the way he had in front of him, and who did he think defendant was, "[a]nd that was it." He said Falcon responded with words like, "you aint' all your shit, nigga, you punk,

9

you little, uh, punk ass little bitch." He said Falcon told him he better go get his "bitch." He said Falcon said Victoria was only with defendant to use him, and that "pissed" defendant off.

Defendant agreed it took him a while to be truthful during the interview.

He acknowledged someone tried to flush the bullets in his house, but said it was not him.

### Further Trial Testimony

In addition to various members of the law enforcement investigative team, the van driver, and Falcon's sister, the People called Victoria to testify.

Defendant also called Victoria, and he testified on his own behalf.

The nature of Victoria's and defendant's relationship was a topic of testimony.

### Victoria's Testimony

According to Victoria, she was in an on and off dating relationship with the defendant from the time she was 20 to 24. They would break up and get back together a lot. Victoria would sometimes sleep at defendant's house. She knew his parents and sister. Victoria was staying with defendant June 28 to 29, 2021. She described their relationship in 2021 as not official but they were sleeping and spending time together.

Victoria admitted that in calls with defendant when he was in jail she repeatedly told him she loved him, and that she wanted him out so they could be together forever. She agreed that sounds more than casual, and that she loved him then and wanted to be together forever.

By trial they no longer had a relationship, and she did not love him anymore.

Victoria agreed defendant is the jealous type, and, while he would speak to her of his jealousies, he would do so in a "quiet manner."

When defendant was in jail after the shooting and Victoria spoke with him on the phone, when she talked about male friends, she would reassure him she was not

10

interested in the other men and was still defendant's. She would reassure him because he gets jealous. She said defendant would not be okay with another man making a V with his fingers and sticking his tongue between them at her.

Defendant's Testimony

Defendant testified that he and Victoria were in a "friends with benefits" situation on June 28, 2021. He said it was an open relationship and he was seeing other people at the time. He was aware Victoria had cheated on him with others, and it made him angry. But it was also "like a whatever thing" because he was doing the same thing.

Defendant said he did not see any disrespectful acts by Falcon towards Victoria when they were in the Tahoe. He said their gathering ended abruptly when Victoria said she was not comfortable. Defendant said when Victoria told him how Falcon had been disrespectful and made her uncomfortable, at first he thought it was weird but he was not upset. But as Victoria gave more details he got upset. This was because when Falcon thought defendant was not looking, Falcon thought defendant would not catch on. Defendant focused on driving home as he heard this.

Defendant said when he and Victoria got back to his house they did more cocaine. This was around midnight. He did not talk about fighting Falcon, call Falcon to yell at him for disrespecting him, or text him about being disrespectful to Victoria.

Defendant testified that when Falcon later sent a text to Victoria wanting more cocaine, he thought "okay" even though he was angry at Falcon. He needed money, and business is business.

Defendant testified that even though Falcon had disrespected him, the thought never came to defendant's mind to kill Falcon.

After getting more cocaine, defendant went back to the hotel and walked around to try to find Falcon. He was texting Falcon and trying to locate him. When Falcon drove by defendant and told him where he was going to park, defendant followed him on foot.

11

Defendant's asking price for the half gram was $50 to $60. He was mad at Falcon, but also high so he didn't really care.

According to defendant, he reached the Tahoe, opened the passenger door, and the two greeted each other asking what was up. According to defendant, Falcon started asking where Victoria was. Defendant would ask if Falcon wanted the half gram or not, but Falcon persistently asked about Victoria. Defendant said Falcon asked, " 'Where is your girlfriend?' "

Falcon asked defendant if he had the cocaine, and defendant said he did. Defendant asked Falcon if he had the money, and Falcon said he did. But the transaction never took place. Falcon wanted defendant to hand over the cocaine first, but defendant wanted to see the money first, which Falcon would not do; he just said he had it. Falcon continued to ask about Victoria—" 'your girl' "—saying he had wanted her to come.

According to defendant, "that's where I was kind of pissed off because I was pissed off initially, because the comments that Victoria had told me, and now he's bringing her up again when I'm just trying to do business and just trying to sell him cocaine."

Defendant testified that they continued arguing—with Falcon wanting the cocaine, defendant wanting to see the money first, and Falcon asking about the whereabouts of Victoria. Defendant testified that he said Victoria was at the house and her whereabouts were not relevant to the transaction.

Defendant testified that Falcon became verbally aggressive and demanded defendant hand over the cocaine, while defendant continued to insist he needed to see the money first.

Defendant testified Falcon got even more aggressive and "straight tried to punk" him. Falcon said, " '[h]and over the fucking cocaine or I'm going to go grab her from you, and I'm taking her from you, and I'm going to take your fucking phone and your money.' " At first defendant chuckled, but then Falcon reached for something behind the

passenger seat, and defendant grabbed the firearm he had in his waistband and shot Falcon. He shot Falcon twice. Defendant was scared because he thought Falcon was going to shoot back. So, he ran.

Defendant admitted he never saw a gun but maintained that he thought Falcon had a gun.

When asked how he felt when he learned Falcon did not have a gun, defendant responded, "I was very surprised. Because I was confused too, because I was like 'What the fuck was he reaching over for something, for what?' It is not like he was reaching over for his wallet. People carry their wallets in their pockets . . . ."

Defendant testified after the shooting he drove home. When the police arrived, he was scared. He went in the backyard and put the gun in a cinder block.

When asked on the stand how he felt about what happened, defendant replied, "I'm remorseful . . . . My intent was never to kill a person. I was just trying to defend myself because at that time I thought my life was in danger and I was scared. I thought he was reaching over for something, and that was just my first initial reaction."

Defendant testified that when detectives interviewed him, he was high and had his guard up because it was the police. He admitted that in the beginning of the interview he denied knowing Falcon, having contact with Falcon, or having any involvement in the crime. He admitted at one point he made a "smart" comment to them about getting the gun from his cousin, then saying his cousin was Mark Zuckerberg, the famous creator of Facebook. He testified he did this because "[t]hey asked me a stupid question." When asked on the stand why he denied everything at first, he said, "[b]ecause at the end I was guilty, so –." Defendant said he first learned Falcon had died during his interview with the officers.

When pressed about whether defendant really saw Falcon with a gun, defendant maintained Falcon was reaching for something and he saw a "GLOCK-like thing," but admitted Falcon never aimed a gun at him. He admitted he lied when he told detectives

13

Falcon pointed a gun at him, but said he was not lying in court.  He admitted that he had lied repeatedly when speaking with detectives.

Defendant said he might not recall every detail of his final interaction with Falcon because his "mind was foggy at the time because [he] was very high.  [H]e was on maybe four controlled substances."

On cross-examination, defendant admitted he is a jealous boyfriend.  He said certain things would "piss him off," and agreed a man making a crude gesture to his girlfriend would be one of those things.  Defendant admitted, the first thing out of Falcon's mouth when defendant approached him at their last meeting was, " '[w]here is your girlfriend?' "  He admitted he and Victoria held each other to Falcon as boyfriend and girlfriend—a couple.  They did not hold each other out like they were in an open relationship.

Defendant admitted that the month after he was arrested, he had more than 60 calls to Victoria, because they were in a relationship.  He admitted he read a letter he wrote to her over the phone in which he said he loved her and wanted to be with her forever.  He admitted that Victoria responded by saying she loved him and could not stand being on the outside without him.  He agreed these were the words of people who are more than friends with benefits.

The following colloquy then occurred:

"[The People] Q  Are you characterizing your relationship as 'friends with benefits' so that you can distance yourself from the anger that you felt when another man made a gesture to eat your girlfriend out in front of you?

"[Defendant] A  What?

"Q  Are you trying to distance the actual fondness that you had for [Victoria] because of this case?

"A  Yes."

On cross examination, defendant admitted that he was "pissed" when he met with Falcon the second time, and that he was "pissed" because Falcon was asking about Victoria. He was pissed that Falcon had made lewd gesture to Victoria and told her he was hard. He agreed Falcon had done all this in front of him, but behind his back, and it made defendant look like a punk. He admitted he was pissed when he pulled the trigger.

Closing Argument

In their closing argument, the People's central theory was that defendant had murdered Falcon out of jealousy, because Falcon had made a sexually explicit pass at Victoria, "the woman [Falcon] knew to be defendant's girlfriend," while defendant was present but "behind [defendant's] back."

Defense counsel began his closing argument by attempting to identify general weaknesses in the People's case.

For example, the People had argued that defendant had jealousy, which was the "raw base emotion" he was "operating off of," which meant when the defendant met with Falcon the last time he was, "getting revenge." In response to this type of argument, defense counsel challenged the idea that defendant was acting out of anger when he travelled to and arrived at the hotel parking lot. He asked the jury to look at the video of defendant walking around the parking lot before he located Falcon and stated it does not show defendant was angry.

Defense counsel then made arguments regarding whether the evidence supported a conviction for murder. He asked why defendant had wandered around the parking lot and parked some distance from Falcon's vehicle if he had planned to kill Falcon when he arrived at the hotel. He suggested if the plan had been to kill Falcon, defendant would have pulled up next to Falcon's vehicle, providing himself with a rapid get away once he shot Falcon.

15

Defense counsel argued, "[t]here is a lot of testimony on what may or may not have happened, but you look at the video, something was happening when he got to the [Tahoe]. There was some sort of communication, whether there was an argument over price of cocaine, whether it was an argument, whether he ripped him off before, whether there was an argument over his girlfriend. There's something going on. [¶] He walks up, puts his hand on the top of the car, opens the car door, and there's a discussion going on." Defense counsel noted defendant fired two gunshots close together, and by the time Falcon was out of the car defendant was already 5 to 10 feet away from the car, and defendant did not wait to see what happened because of the shots. He argued defendant ran because he was afraid Falcon was going to shoot him, "[b]ecause he honestly believed that Mr. Falcon had a gun."

Defense counsel addressed self-defense and imperfect self-defense together. He stressed that defendant said in his interview with detectives and on the stand that he believed Falcon had a gun when he reached for something. He argued that whether Falcon really had a gun did not matter as much as what defendant believed, and that it was dark, and Falcon's car floor was cluttered at the time of the shooting. He noted that one part of defendant's story that never changed was his statement that he thought Falcon had a gun. He encouraged the jury to consider the area and context in which the shooting occurred—a high crime area that required good surveillance cameras, and the parties were engaged in a criminal transaction—when considering if it was reasonable for defendant to believe Falcon was reaching for a gun.

He argued if the jury found defendant's actions reasonable, they could "stop right there," because they would be required to find defendant not guilty, under a theory of self-defense. He also argued, "[i]f you believe a story but don't believe his actions are reasonable, you can also stop right there because then you must find him for imperfect self-defense." Counsel acknowledged there were some inconsistencies in his client's

16

testimony, offering that this was because of the time that had elapsed between the killing and the trial.

Defense counsel then addressed a heat of passion voluntary manslaughter instruction. He said, "[i]f you believe the prosecution's theory that Mr. Falcon upset my client so much that he was willing to kill, then you also must consider whether or not it happened at the moment—at the time that they were having the conversation in the car, that something at that point in time triggered that reaction. [¶] Because you can look at the video and see that he wasn't upset when he got to the car. He was wandering around, walked up casually, put his hand on the car, opened the door. [¶] And if you find that it was at that moment when Mr. Amador, something triggered him, then you have to find voluntary manslaughter, heat of passion."

Defense counsel then made arguments to cast doubt on some of Victoria's testimony.

Defense counsel briefly addressed voluntary intoxication towards the end of his argument. He told the jury they could only consider defendant's voluntary intoxication in a limited way, "in deciding whether or not the defendant acted with the intent to kill or the defendant acted with deliberation and premeditation. There isn't much evidence on this." He finished up by urging the jury to use their common sense and reminding them of the reasonable doubt standard.

### STANDARD OF REVIEW

"In order to establish a claim for ineffective assistance of counsel, a defendant must show [(1)] that his or her counsel's performance was deficient and [(2)] that the defendant suffered prejudice as a result of such deficient performance. (*Strickland v. Washington* (1984) 466 U.S. 668, 687–692 [] [(*Strickland*)].)" (*People v. Mickel* (2016) 2 Cal.5th 181, 198 (*Mickel*).) If either element is not proven, the defendant's claim fails. (*Strickland*, at p. 687.) Thus, a reviewing court may reject a claim of ineffective

17

assistance of counsel without addressing both components if a defendant makes an insufficient showing as to either issue. (*Ibid.*)

"To demonstrate deficient performance, defendant bears the burden of showing that counsel's performance ' " ' "fell below an objective standard of reasonableness . . . under prevailing professional norms." ' " ' (*People v. Lopez* (2008) 42 Cal.4th 960, 966 [].)" (*Mickel*, *supra*, 2 Cal.5th at p. 198.) " 'Reasonableness must be assessed through the likely perspective of counsel at the time.' " (*People v. Smothers* (2021) 66 Cal.App.5th 829, 860.)

"As [our Supreme Court has] observed in the past, certain practical constraints make it more difficult to address ineffective assistance claims on direct appeal rather than in the context of a habeas corpus proceeding. (See *People v. Snow* (2003) 30 Cal.4th 43, 94–95 []; *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266–268 [] (*Mendoza Tello*).) The record on appeal may not explain why counsel chose to act as he or she did. Under those circumstances, a reviewing court has no basis on which to determine whether counsel had a legitimate reason for making a particular decision, or whether counsel's actions or failure to take certain actions were objectively unreasonable. (*Mendoza Tello*, at pp. 267–268.)" (*Mickel*, *supra*, 2 Cal.5th at p. 198.)

"Moreover, we begin with the presumption that counsel's actions fall within the broad range of reasonableness, and afford 'great deference to counsel's tactical decisions.' (*People v. Lewis* (2001) 25 Cal.4th 610, 674 [].) Accordingly, [the Court has] characterized defendant's burden as 'difficult to carry on direct appeal,' as a reviewing court will reverse a conviction based on ineffective assistance of counsel on direct appeal only if there is affirmative evidence that counsel had ' " 'no rational tactical purpose' " ' for an action or omission. (*People v. Lucas* (1995) 12 Cal.4th 415, 437 [].)" (*Mickel*, *supra*, 2 Cal.5th at p. 198.)

If the record on appeal sheds no light on why trial counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be

rejected unless counsel was asked for an explanation and failed to provide one or there could be *no satisfactory explanation*. (*Mendoza Tello*, *supra*, 15 Cal.4th at p. 266.) " '[W]e cannot evaluate alleged deficiencies in counsel's representation solely on defendant's unsubstantiated speculation.' " (*People v. Bonilla* (2018) 29 Cal.App.5th 649, 658.) Thus, "we may reverse 'only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.' " (*People v. Arredondo* (2019) 8 Cal.5th 694, 711.)

In considering forgoing possible objections, competent counsel may forgo even a valid objection for the tactical purposes of avoiding the prosecutor eliciting the objected to information with a more compelling foundation, or to avoiding highlighting testimony to the fact finder. (*People v. Campbell* (2020) 51 Cal.App.5th 463, 506.) Thus, " 'a mere failure to object to evidence . . . seldom establishes counsel's incompetence.' " (*People v. Wharton* (1991) 53 Cal.3d 522, 567; accord, *Campbell*, at p. 505.)

"To demonstrate prejudice, defendant bears the burden of showing a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different." (*Mickel*, *supra*, 2 Cal.5th at p. 198.) "To establish prejudice, '[i]t is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." ' [Citation.] . . . '*The likelihood of a different result must be substantial*, not just conceivable.' " (*People v. Brewer* (2021) 65 Cal.App.5th 199, 220.)

I

*Use of Victoria's Purported Opinion*

The People questioned Victoria about her conversation with Detective Monroe at defendant's home on the day of the murder. As part of this examination, the People asked, "[d]id you tell Detective Monroe, 'If that man is dead and that's the same man from last night, then obviously it was Adan. Adan was mad at him, and obviously he left,

19

and he never parks his car in there, and it is clear as fuck.'?"  Victoria responded, "I don't remember."

Defendant argues his trial counsel was ineffective because counsel "allowed the People to elicit Victoria's opinion that 'obviously it was Adan,' 'clear as fuck.' "  This argument fails.  Even if the People's question can be characterized as eliciting Victoria's opinion, the opinion she offered was not prejudicial.  (See *Mickel*, *supra*, 2 Cal.5th at p. 198 [defendant must show prejudice as a result of deficient performance]; see also *People v. Torres* (1995) 33 Cal.App.4th 37, 49 [need to show result would have been different].)

Defendant's own statements when he testified and when he spoke with detectives established that he shot Falcon and was angry at Falcon.  If the jury believed that Victoria said, "it was Adan," and "Adan was mad at him," because the People asked if she said those things, it would not have impacted the irrefutable conclusion that defendant fired the fatal shots and was angry with Falcon.

II

*Cross Examination of Victoria*

In his second argument, defendant says his trial counsel was ineffective because he failed to cross-examine Victoria regarding possible motivations to lie that she might have harbored at the time of trial.

Defendant notes that the precise nature of the relationship between defendant and Victoria was somewhat ambiguous.  Defendant claims that at trial, the parties disagreed about whether Victoria and defendant were boyfriend and girlfriend or "friends-with-benefits" when defendant shot and killed Falcon.  Defendant claims the nature of the relationship between Victoria and defendant was central to the issue of what motive he may have had to kill Falcon.  As an example of the importance of the nature of the relationship between the defendant and Victoria played at trial, defendant quotes from a

portion of the trial when the prosecutor asked him, "[a]re you characterizing your relationship as 'friends with benefits' so that you can distance yourself from the anger that you felt when another man made a gesture to eat your girlfriend out in front of you?"

Defendant argues, "[t]he jury had the question of the nature of [Victoria]'s relationship with the appellant squarely presented to it and of course her personal feelings toward the appellant at the time of trial were important, too, and thus probing questioning along these lines would have been helpful to the jury as well perhaps to the appellant." As an example, defendant argues his trial counsel could have asked Victoria how she knew defendant did not hear Falcon say lewd things to her even though defendant was sitting closer to Falcon than Victoria when the three of them were in Falcon's Tahoe.

Defendant's theory and argument on this point is difficult to discern. Whatever defendant's theory may be, defendant has not demonstrated prejudice due to defense counsel's failure to cross-examine Victoria about reasons she might lie on the stand. The example defendant gives of Victoria's testimony which he implies is suspicious—when she testified defendant did not hear what Falcon said to her in the Tahoe—is of no aid to him because Victoria is not the only one that testified defendant did not hear Falcon's statements to her. Defendant also testified that he was unaware that Falcon was "being disrespectful towards [Victoria], and he made her feel uncomfortable" until Victoria said something about Falcon's behavior when they left. On cross-examination, he offered he was not aware that Falcon was hitting on Victoria when they were in the Tahoe because he was "probably on the phone." And notably, defendant's argument quoted above is that "probing questioning along these lines would have been helpful to the jury as well as perhaps to the appellant." Questioning that would be "helpful" to the jury and "perhaps" helpful to the defendant is not the test for prejudice in this context.

21

III

*Testimony of Detective Monroe and Use of the Words "Boyfriend" and "Girlfriend"*

Defendant claims his trial counsel failed to "push back effectively" on the prosecution's examination of Detective Monroe. Defendant suggests:

When the prosecutor examined Detective Monroe, the prosecutor worded questions in a way that suggested she was quoting from a transcript of an interview Detective Monroe conducted with Victoria on the day of the murder. The prosecutor would ask Detective Monroe questions that solicited a "yes" or "no" response. In phrasing the questions, the prosecutor would refer to Victoria as defendant's "girlfriend," and to defendant as Victoria's "boyfriend." Detective Monroe would then give a perfunctory response indicating her agreement with the prosecutor's question. Defendant argues that if one were to look at the actual transcript of the interview between Detective Monroe and Victoria, it would show that during the interview the word "boyfriend" was used only twice and "girlfriend" was never used.

Defendant argues that by asking yes or no questions that used the words "boyfriend" and "girlfriend," the prosecution, "gave the false impression that the transcript of the interview of [Victoria] was evidence that she referred to appellant as her 'boyfriend' that often, thus fabricating evidence that served to bolster the People's theory regarding motive. Appellant's trial counsel failed to push back against that illicit effort."

Defendant again argues the characterization of his relationship with Victoria was important, because (1) the People's case relied in part on the assumption that defendant's actions were motivated by jealousy; (2) the People wanted to convince the jury that Victoria and defendant were in a boyfriend and girlfriend relationship; and (3) any evidence defendant presented to the contrary was meant to "distance" him from that relationship and weaken the People's motive theory.

22

Defendant's argument again fails.  First, in attempting to contrast the terminology Victoria used in the actual interview with Detective Monroe with the terminology used in the prosecutor's questions at trial, defendant refers this court to the transcript of Detective Monroe's interview with Victoria.  But the exhibit defendant cites does not match the description of the exhibit in defendant's brief.  Thus, defendant has failed to provide us with the record we need on appeal to verify his characterization of the evidence.  On this basis alone, this claim must fail.  " ' "Perhaps the most fundamental rule of appellate law is that the judgment challenged on appeal is presumed correct . . . ." . . .  " 'We must indulge in every presumption to uphold a judgment, and it is defendant's burden on appeal to affirmatively demonstrate error—it will not be presumed.' " . . .  [T]he defendant further bears the burden to provide a record on appeal which affirmatively shows that there was error below, and any uncertainty in the record must be resolved against the defendant.' (*People v. Sullivan* (2007) 151 Cal.App.4th 524, 549 [].)  Where an appellant fails to supply a record adequate for review, his claim must fail." (*People v. Chubbuck* (2019) 43 Cal.App.5th 1, 12.)

In any event, defendant cannot show he was prejudiced by this questioning.  (See *Mickel*, *supra*, 2 Cal.5th at p. 198.)  It may be that the prosecutor benefited from portraying defendant and Victoria as in a close boyfriend/girlfriend relationship, supplying defendant with an enhanced motive to murder a man who had lewdly made passes at Victoria while defendant sat next to them, obliviously scanning his phone.  Likewise, it may be that the more defendant was able to make his relationship with Victoria seem casual, the better chance he had of the jury believing the only reason he killed Falcon was because he feared for his life.  But even without Detective Monroe's testimony, the jury was provided with ample other evidence (1) of the nature of defendant and Victoria's relationship, his strong feelings about her, and that he called her his "girlfriend" the day of the murder; and (2) of defendant's jealousy when it came to Victoria and/or his anger about being "disrespected" by Falcon when it came to her.

23

Victoria testified that when defendant was in jail, she reportedly told him she loved him, and she wanted him out so they could be together forever. She said when she confronted Falcon about his behavior, she said, "[m]y boyfriend is right here." She testified when defendant was in jail, she would make sure to reassure defendant she was not interested in other men she talked about, and that she was still defendant's, because defendant is the jealous type. He would not be okay with a man making a gesture to Victoria like the one Falcon had made. Victoria admitted that though she may have told Detective Monroe that she and defendant were friends with benefits, she felt that at around the time of the shooting, things were good between her and defendant, and they were more boyfriend and girlfriend.

Similarly, while defendant may have tried to minimize his relationship with Victoria on the stand, he testified about Falcon asking him where his "girlfriend" was when they met at the time of the shooting. He also said Victoria had called him her "boyfriend" when she confronted Falcon. Defendant testified that at the time of their last meeting, Falcon kept asking where Victoria was and stating he had wanted her to come. Defendant testified he was kind of "pissed off" when Falcon asked about Victoria.

Defendant admitted that he and Victoria had held themselves out to Falcon as boyfriend and girlfriend, like a couple, to Falcon.

Defendant admitted that in a jail call with Victoria while he was in custody, he read her a letter in which he told her he loved her and wanted to be with her forever, and she reciprocated that she loved him too, and could not stand being outside without him. He agreed the words they exchanged were not the words of people who were just friends with benefits. And *he agreed* that he was trying to distance "the actual fondness that [he] had for [Victoria] because of this case[.]" He was angry that Falcon had made lewd gestures and statement to Victoria, and Falcon did it in a way that made defendant look like a punk. He admitted he was angry when he pulled the trigger.

24

Finally, the People did not need to rely on Victoria's characterization of her relationship with defendant when she spoke to Detective Monroe on June 29, 2021, to determine how defendant felt on June 29, 2021.  A better way to determine how *he felt about her on the day of the murder* was evidence of what he said on the day of the murder.  What he said was captured in his interview with detectives, during which: (1) he called Victoria his girlfriend; (2) he suggested he hoped their relationship would go the distance; (3) he said he did not go for help after the shooting because Falcon had previously disrespected him and his "girlfriend" by behaving in a sexual manner with Victoria; (4) he said he was "jealous that [Falcon] was already trying to get at [his] girl" when he left to meet Falcon in Elk Grove and was not bothered that Falcon might have wanted to fight him; and (5) he admitted to becoming angry when Falcon told him Victoria was only with defendant to use him.  Given the evidence, there is no likelihood of a more favorable result had the prosecutor phrased her questions for Detective Monroe differently.  (*People v. Brewer, supra,* 65 Cal.App.5th at p. 220.)

IV

*Voluntary Manslaughter Theories*

Defendant argues that his trial counsel was ineffective because counsel did not sufficiently emphasize the possibility of the jury returning a lesser verdict to murder of voluntary manslaughter based on heat of passion or imperfect self-defense.  Defendant reasons that he is the only person who had personal knowledge about his conversation with Falcon in the moments before defendant shot Falcon.  Quoting from large portions of his interview with detectives and his trial testimony, defendant argues that during that conversation Falcon became increasingly verbally aggressive; angered defendant by bringing up Victoria when he was just trying to do business, particularly considering what Victoria had told him about how Falcon had treated her before; and threatened to forcefully take defendant's keys and money if defendant did not hand over cocaine

25

immediately before reaching over for something in the back seat. Defendant claims that if the jury believed his statements, that belief would have justified the jury entering a verdict of manslaughter based on heat of passion or imperfect self-defense. Defendant argues that because his trial counsel was prejudicially ineffective because during closing argument counsel did not mention what defendant claimed he and Falcon said in their last meeting.

"Murder is the unlawful killing of a human being . . . with malice aforethought." (Pen. Code, § 187, subd. (a).) "Manslaughter is an unlawful killing without *malice*, the element necessary for the greater offense of murder." (*People v. Rios* (2000) 23 Cal.4th 450, 454; Pen. Code, § 192.) "Heat of passion and imperfect self-defense voluntary manslaughter are lesser included offenses of murder. (*People v. Simon* (2016) 1 Cal.5th 98, 132 [] [imperfect self-defense]; *People v. Cole* (2004) 33 Cal.4th 1158, 1215 [] [heat of passion].)" (*People v. Chestra* (2017) 9 Cal.App.5th 1116, 1121.)

" 'Heat of passion is one of the mental states that precludes the formation of malice and reduces an unlawful killing from murder to manslaughter.' [Citations.]" (*People v. Wang* (2020) 46 Cal.App.5th 1055, 1069.)

" 'Under the doctrine of imperfect self-defense, when the trier of fact finds that a defendant killed another person because the defendant actually, but unreasonably, believed he was in imminent danger of death or great bodily injury, the defendant is deemed to have acted without malice and thus can be convicted of no crime greater than voluntary manslaughter.' (*In re Christian S.* (1994) 7 Cal.4th 768, 771 [].)" (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1048.)

"Both heat of passion and imperfect self-defense voluntary manslaughter focus on the defendant's subjective state of mind. [Citation.] For heat of passion voluntary manslaughter to apply, the defendant must be under the actual influence of a strong passion that obscures reason at the time of the homicide. [Citations.] Imperfect self-defense requires that the defendant be in actual fear of imminent danger to life or great

26

bodily injury at the time of the homicide." (*People v. Chestra, supra,* 9 Cal.App.5th at pp. 1121-1122.) Thus, killing under a heat of passion or sufficient provocation, or in imperfect self-defense involve mitigating circumstances that reduce murder to voluntary manslaughter, " ' "by *negating* the element of malice that otherwise inheres in such a homicide [citation]." ' " (*People v. Schuller* (2023) 15 Cal.5th 237, 252-253.)

"The decision of how to argue to the jury after the presentation of evidence is inherently tactical." (*People v. Freeman* (1994) 8 Cal.4th 450, 498.) Recognizing the value of counsel maintaining credibility before a jury, our Supreme Court has even, "repeatedly rejected claims that counsel was ineffective in conceding various degrees of guilt." (*Ibid.*) Similarly, the United States Supreme Court has stated that, "counsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage." (*Yarborough v. Gentry* (2003) 540 U.S. 1, 5-6.) "[W]hich issues to sharpen and how best to clarify them are questions with many reasonable answers." (*Id.* at p. 6.)

Defendant suggests that in closing argument his trial counsel "ignored what was said at the [final] meeting," between defendant and Falcon in that he failed "to mention what was said." While defense counsel may not have quoted defendant's testimony directly, this is not an accurate characterization of what counsel said. He said, "[t]here was some sort of communication, whether there was an argument over price of cocaine, whether it was an argument, whether he ripped him off before, whether there was an argument over his girlfriend. There's something going on." He also argued that defendant's demeanor before and after the shooting suggested whatever "triggered" defendant to shoot Falcon—be it a reasonable or unreasonable belief that Falcon was reaching for a gun to kill him, or anger because of something Falcon said—happened during defendant's and Falcon's conversation at the Tahoe.

Importantly, counsel focused on securing a not guilty verdict for his client based on self-defense by emphasizing defendant's belief that Falcon was reaching for a gun. Counsel relied heavily on how the video evidence would support a finding that something happened during defendant's and Falcon's interaction that led defendant to shoot and urged a finding of self-defense. He then argued why, even if the jury did not find self-defense, it should find at most defendant was guilty of manslaughter.

On this record there are satisfactory tactical explanations for why counsel did not go into detail about what defendant claimed Falcon said to him. (See *People v. Arredondo, supra,* 8 Cal.5th at p. 711.) First, the jury heard defendant testify and the video of his interview with detectives was entered into evidence. Counsel was able to remind the jury of the possible nature of defendant's dispute with Falcon with the summary of the topics defendant had identified. Second, counsel lent credibility to the arguments he was making by (a) focusing on the irrefutable video evidence, and (b) acknowledging there might have been some inconsistencies in defendant's testimony. Third, counsel may have decided to focus on the self-defense theory because he understood that if he succeeded on that his client would have walked free, and he opted not to belabor the details of the voluntary manslaughter theories.

On this record, we cannot find that defendant's trial counsel was ineffective for failing to emphasize defendant's statements about his last conversation with Falcon and how they may have supported a finding that defendant was guilty of voluntary manslaughter but not murder.

V

*Voluntary Intoxication Evidence*

Defendant argues his trial counsel was prejudicially ineffective for failing to investigate into and produce evidence during trial regarding the impact of his voluntary intoxication.

28

The court held an on the record discussion regarding the merits of instructing the jury with CALCRIM No. 625, which, as ultimately provided to the jury, read, in part, "[y]ou may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted with . . . deliberation and premeditation."

Relying on *People v. Morales* (2021) 69 Cal.App.5th 978, and the cases *Morales* relied on, the People argued that the instruction was not required due to a lack of evidence that defendant's cocaine use affected his thought process in any way. The People stated all that had been admitted on the issue was defendant's and Victoria's testimony that he had done cocaine. The People observed that there was testimony that one gram was shared among three people, but who took what, where, and how much was not in the record.

The People also noted there was no testimony about the effect of cocaine on any individual, let alone defendant. The People noted there was some evidence that defendant had a drug habit—he had been dealing since he was 16 and used the money he earned dealing to support his habit. However, "what his habit is, how the cocaine affected him or any other drug he ingested affected him is absolutely not on the record." The People argued there was no evidence regarding how cocaine affected the defendant's, "willingness or his ability for his brain to operate," and, as a result, the instruction for voluntary intoxication was not supported.

When asked for his thoughts, defense counsel argued, "I concur in part. I think *Morales* is very telling. What my take from it is is that there has to be evidence to support that the intoxication did something to his mental facilities that would negate an element, but there's no evidence of that other than the fact that he was under the influence of it. In fact, most of the evidence was to the contrary, he was able to recognize there was a danger, he recognized that he should leave. He was able to drive a vehicle, and I think

there is no evidence to show exactly how it affected him, and, therefore, I don't think we can legally argue defense, unfortunately."

Defense counsel then stated the defense would withdraw the request for the voluntary intoxication instruction.

The court then noted defendant's testimony during cross-examination, in which he said his brain was foggy when he met with Falcon, and he could not recall every detail of the meeting. The trial court asked, "[i]s that sufficient to instruct on voluntary intoxication?"

The People argued that the testimony to which the trial court referred only provided information regarding defendant's ability to recall details. It did not provide evidence regarding his ability to form an intent to kill. The People noted there was no testimony from the defendant or from an expert how the drug use affected defendant's "thought process at the time the trigger was pulled."

The court again asked defense counsel if he wanted the voluntary intoxication instruction, and counsel responded his client wanted the instruction.

The court decided to give the instruction.

The court explained, "I think, as I cannot say as a matter of law, that testimony is insufficient to support a juror having a reasonable doubt, whether the specific intent was formed. I grant every point you've made, but I think that's argument that's as the weight of it, not the threshold legal question, is there sufficient evidence to instruct? [¶] And I'm concerned if the appellate court thinks the instruction should have been given, that is a fatal detail to the case, but I am going to give 625."

Under Penal Code section 29.4, subdivision (a), "[n]o act committed by a person while in a state of voluntary intoxication is less criminal by reason of his or her having been in that condition. Evidence of voluntary intoxication shall not be admitted to negate the capacity to form any mental states for the crimes charged, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with

30

which the accused committed the act." Section 29.4, subdivision (b), carves out an exception to this rule. It states, "[e]vidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought." (*Ibid.*)

Based on the headings used in his opening brief, the precise nature of defendant's fifth argument once again is not clear. Looking at the headings and reading the text of the argument, his argument appears to be this: on the stand, defendant testified that he might not recall every detail surrounding the shooting because his mind "was foggy" because he was "very high" because he was "on maybe four controlled substances." He and Victoria both testified he had done cocaine in the hours leading up to the killing, and he also testified he had smoked marijuana. Despite this testimony, his counsel did not seek to introduce expert testimony or to otherwise solicit any testimony regarding the impact defendant's voluntary intoxication had on his ability to form the requisite intent to commit murder or to deliberate and premeditate prior to committing the murder. Additionally, the trial court's use of the voluntary intoxication instruction did not diminish the impact of trial counsel's failure to solicit this evidence. Instead, the discussion the parties had regarding the use of the instruction shows that the court and both parties recognized there was a lack of evidence on this issue. In turn, the recognition of a lack of evidence ought to have prompted defense counsel either to solicit the evidence or to explain why he was not offering that evidence.

This argument is unpersuasive. In his closing argument, defense counsel focused on the theory that defendant believed Falcon had a gun and feared for his life. He sought to present this belief and fear as reasonable. He led with the theory that his client should be found not guilty of any crime. Tactically, it makes sense that he would not want to present evidence that his client was not capable of making rational judgments and assessments at the time of the homicide, because he needed the jury to believe his client

31

could fairly assess the risk he was facing at the time of the murder. Indeed, when he initially stated why he was not sure the voluntary intoxication defense was needed, he pointed to evidence that defendant was fairly lucid at the time of the murder, and included a comment that, his client "was able to recognize there was a danger, he recognized that he should leave." Though this may not be a word for word explanation of why counsel did not solicit further evidence on the impact of defendant's drug use, it does suggest that admitting that evidence would not benefit, and might even work against, his primary theory of the case.

VI

*Questions that Called for "Speculation" or "Opinion"*

In his brief, defendant includes an argument which he has labeled with the heading that says, "appellant's trial counsel repeatedly failed to object to questions which called for speculation." Then, in the text of the argument, defendant argues that the subject testimony called for lay witness testimony about his mental state, which is impermissible. In the text, defendant also argues that assuming the jury believed the lay witness's testimony about defendant's mental state, his counsel should have investigated mental health defenses. Regardless of which argument defendant is making—that the questions called for speculation or that they permitted the admission of impermissible lay witness testimony—the argument lacks merit.

For this argument, defendant identifies four sets of questions the People asked Victoria. In each instance, the People asked Victoria if she had ever made a particular statement to law enforcement. Specifically, the People asked: (1) if Victoria described defendant's smile when Victoria told defendant about Falcon's behavior as "a psychotic smile"; (2) if Victoria ever described "his reaction . . . as though the defendant looked psychotic"; (3) if Victoria ever told Detective Monroe she thought defendant was a psychopath and if she told Detective Monroe she felt that way based on a story defendant

32

had told about punching himself in the face, calling the cops, and claiming someone else had punched him; and (4) if Victoria told Detective Monroe that when defendant asked her to text Falcon to lure him into meeting again and entrap him in a fight, she said to defendant, " '[y]ou're a psycho.  Just let it go, like, who cares?' "

Trial counsel did not object to these questions on any grounds.  Victoria responded, "[y]es," when the People asked her, "[w]hen Detective Monroe asked you why the defendant was a psychopath, did you tell her, '[b]ecause the defendant once told me a story where this girl, he punched himself in the face, and he called the cops and told them that she had punched him'?"  In the other three sets of questions defendant cites, Victoria responded that she did not remember.

When the defense called Victoria as a witness, counsel revisited the issue of whether Victoria had said anything about defendant having a psychotic smile.  Victoria continued to testify that she did not remember saying defendant had a psychotic smile.  Defense counsel and Victoria had the following exchange:

"[Defense Counsel] Q  Do you have a degree in psychology?

"[Victoria] A  No.

"Q  So when you use the term 'psychotic,' it is just –

"A  It is not credible, obviously, since I didn't go to school for psychology.

" . . .

"Q  BY [Defense counsel]:  So when you use that term, you're using it as a lay person's opinion, not as an expert opinion; is that correct?

"A  Yes."

The Testimony Did Not Call for Speculation

An examiner's question of a lay witness calls for speculation and conjecture when it asks the "witness to testify to facts that the witness has not personally observed, or to state an opinion not based on his or her own observations." (*People v. Rodriguez* (2014)

33

58 Cal.4th 587, 631.) These questions are prohibited under Evidence Code sections 702 and 800. (See *Rodriguez*, at p. 631.) Victoria's testimony dealt only with her personal experiences and observations of defendant and, thus, was not in an evidentiary sense speculation. Defense counsel did not commit error by failing to object that the prosecutor's questions called for speculation, because they did not ask Victoria to speculate. They asked her to recall if she had said something to detectives.

### Counsel Was Not Ineffective for Allowing the Questions

"The decision whether to object to evidence at trial is a matter of tactics and, because of the deference accorded such decisions on appeal, will seldom establish that counsel was incompetent." (*People v. Lucas, supra,* 12 Cal.4th at p. 444.)

Whatever objection defense counsel may have been able to raise to the questions identified, the record suggests a sound tactical reason not to. Rather than object to the questions, defense counsel took a less disruptive approach and addressed Victoria's alleged past statements that defendant smiled or acted psychotic or was a "psycho," by minimizing their possible weight. He did this by eliciting testimony from Victoria that made it "obvious[]" that she is not an expert on mental health issues, and the jury should not take her statements that defendant was psycho as a credible assessment of his mental condition. This also minimized any possible prejudice defendant may have suffered because of the questions asked by emphasizing what the jury likely already suspected: Victoria's statements were not the formal diagnoses of an expert. No reasonable juror was going to conclude defendant met the criteria for being diagnosed as a psychotic based on Victoria's statements. For the same reason, Victoria's answer demonstrates there was no real impetus to investigate mental health defenses based on psychosis because of Victoria's purported statements.

34

Defendant has failed to demonstrate that his counsel was deficient or that he suffered prejudice based on how his counsel reacted to this line of questions. (See *Strickland*, *supra*, 466 U.S. at pp. 687–692; *Mickel*, *supra*, 2 Cal.5th at p. 198.)

VII

*Non-Objection to Leading Questions*

In his final argument, defendant argues that his trial counsel was ineffective because he did not object to the use of leading questions by the People at trial. To support this argument, defendant cites to 12 instances in which the People either asked a witness about the nature of Victoria and defendant's relationship at the time of the murder, or in which the prosecutor asked Detective Monroe questions that can be answered with a "yes" or "no" and referred to defendant as Victoria's "boyfriend." Defendant argues the nature of the relationship between Victoria and defendant is relevant to the issue of the motive defendant had for shooting Falcon.

We reject this for the same reason we concluded defendant could not show prejudice in his third argument, in which defendant argued defense counsel was ineffective for failing to "push back" on the prosecution's direct examination of Detective Monroe. The most damning evidence presented that defendant's feelings for Victoria and his reaction to another man making lewd sexual advances to her may have motivated defendant to harm Falcon was the words he said to detectives and on the witness stand. Defendant has not shown prejudice suffered by this questioning.

DISPOSITION

The judgment is affirmed.

_____,

HULL, Acting P. J.

We concur:

_____

RENNER, J.

_____

KRAUSE, J.

36